```
 1  Michael S. Kun (State Bar No. 208684)
 2  Kevin D. Sullivan (State Bar No. 270343)
    EPSTEIN BECKER & GREEN, P.C.
 3  1925 Century Park East, Suite 500
 4  Los Angeles, CA 90067
    Telephone: 310.556.8861
 5  Facsimile: 310.553.2165
 6  mkun@ebglaw.com
    ksullivan@ebglaw.com
 7
 8  Attorneys for Defendant
    RURAL/METRO FIRE DEPT., INC.
 9
```

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE SANTIAGO, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RURAL/METRO FIRE DEPT., INC., an Arizona corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: **'24CV0544 LL  AHG**<br><br>**NOTICE OF REMOVAL OF ACTION BY DEFENDANT RURAL/METRO FIRE DEPT., INC. UNDER 28 U.S.C. §§ 1332(D) [CLASS ACTION FAIRNESS ACT OF 2005]** |

DEFENDANT RURAL/METRO FIRE DEPT., INC.'S NOTICE OF REMOVAL

FIRM:64083368v1

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA:**

**PLEASE TAKE NOTICE** that Defendant Rural/Metro Fire Dept., Inc. ("Defendant"), contemporaneously with the filing of this notice, is effecting the removal of the above-captioned action, *Jose Santiago vs. Rural/Metro Fire Dept., Inc.*, case no. 37-2024-00005548-CU-OE-CTL, from the Superior Court of the State of California for the County of San Diego ("State Court Action") to the United States District Court for the Southern District of California. Jurisdiction is invoked pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453, in that the number of members of the proposed plaintiff class in the aggregate is more than 100, Plaintiff Jose Santiago ("Plaintiff") is a citizen of a state different than Defendant, and the amount in controversy exceeds $5,000,000.00, exclusive of costs and interest.

## I.   PLEADINGS, PROCESS AND ORDERS

1. On or about February 6, 2024, Plaintiff commenced the above-captioned action in the Superior Court of the State of California, County of San Diego, against Defendant. The action is entitled *Jose Santiago vs. Rural/Metro Fire Dept., Inc., et al.* and is assigned case no. 37-2024-00005548-CU-OE-CTL. True and correct copies of the original summons and complaint that were served upon Defendant on February 20, 2024 are attached hereto collectively as Exhibit 1.

2. Exhibit 1 constitutes all of the process, pleadings and orders served on Defendant in the State Court Action.

3. On March 20, 2024, Defendant filed and served its answer in the State Court Action. Attached as Exhibit 2 is a copy of the answer, which constitutes all of the pleadings and other papers served by Defendant in the State Court Action.

## II.   BASIS FOR REMOVAL

4. This action is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to the United

States District Court by Defendant pursuant to the provisions of 28 U.S.C. §§ 1332(d), 1441 and 1453 in that it is a purported class action in which there are more than 100 putative class members, it is between citizens of different states, and the amount in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.

5. CAFA was enacted to expand federal jurisdiction over purported class actions. It provides that a purported class action may be removed in accordance with 28 U.S.C. § 1446 if: (a) membership in the putative class is not less than 100; (b) any member of the plaintiff class is a citizen of a foreign country or a state different from any defendant; and (c) the aggregate amount in controversy exceeds $5,000,000.00. 28 U.S.C. §§ 1332(d), 1453(b).

6. As explained more fully below, this Court has original jurisdiction under CAFA over all claims brought by Plaintiffs, on behalf of themselves and all members of the putative class. Because Plaintiff's action could have been filed in this Court, Defendant may remove it pursuant to 28 U.S.C. § 1441.

### A.     Size of the Proposed Class

7. CAFA's requirement that proposed class membership be no less than 100 (28 U.S.C. § 1332(d)(5)) is satisfied here because the putative class has more than 100 members.

8. Plaintiff seeks to represent all "current and former non-exempt employees of any of the Defendants within the State of California at any time commencing four (4) years preceding the filing of Plaintiff's complaint up until the time that notice of the certified class action is provided to the class . . . ." Compl., ¶ 17.

9. Defendant has employed approximately 296 non-exempt employees in California since February 22, 2021. Semar decl., ¶ 4a. Accordingly, the putative class has more than 100 members.

### B. Citizenship

10. CAFA's requirement that any one member of the proposed class be a citizen of a state different from any defendant (28 U.S.C. § 1332(d)(2)) is also satisfied here.

11. Plaintiff avers in his complaint that he "is an individual residing in the State of California. Compl., ¶ 6. In addition, information supplied to Defendant by Plaintiff and maintained in Defendant's files reflects that Plaintiff has lived and worked in California since at least 2021. Semar decl., ¶ 7. Moreover, Plaintiff avers in the complaint that Defendant, "at all times . . . mentioned [in the complaint] w[as], (a) conducting business in the County of San Diego, State of California, and (b) the employer of Plaintiff . . . consistent with the California Labor Code and Industrial Welfare Commission Wage Orders ('Wage Orders')," and Plaintiff alleges that he was employed by Defendant "to work as a Rescue Technician from approximately April 2018 to October 2023." Compl., ¶¶ 11, 22. All of these facts are indicia of Plaintiff's California citizenship. *Anderson v. Watts*, 138 U.S. 694, 706 (1891) ("The place where a person lives is taken to be his domicile until facts adduced establish the contrary; and a domicile, when acquired, is presumed to continue until it is shown to have changed."); *CarMax Auto Superstores CA LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1091, fn. 38 (C.D. Cal. 2015) ("Allegations that a party has an extensive and continuous period of residence and employment in a state are sufficient to establish that the party is a citizen of the state"); *Lew v. Moss*, 797 F.2d 747, 749–50 (9th Cir. 1986) (noting that the factors relevant to domicile determination include residence and place of employment); *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 885 (9th Cir. 2013) (observing "that the party with the burden of proving citizenship may rely on the presumption of continuing domicile, which provides that, once established, a person's state of domicile continues unless rebutted with sufficient evidence of change").

12. "In determining whether there is diversity of citizenship between corporate parties, a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." *United Computer Systems, Inc. v. AT&T Corp.*, 298 F.3d 756, 763 (9th Cir. 2002) (internal citations omitted).

13. Defendant is a corporation formed under the laws of Arizona and has its principal place of business in Arizona. Semar decl., ¶ 2.

14. For these reasons, the requirements for diversity jurisdiction are met because Plaintiff and Defendant are citizens of different states.

### C. **Amount In Controversy**

15. A notice of removal need only provide a "'plausible allegation that the amount in controversy exceeds the jurisdictional threshold,' and need not contain evidentiary submissions." *Fritsch v. Swift Transportation Co. of Arizona, LLC*, 899 F.3d 785, 788 (9th Cir. 2018) (quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014)). As the Ninth Circuit has explained, "the amount in controversy is not limited to damages incurred prior to removal." *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 414 (9th Cir. 2018). "Rather, the amount in controversy is determined by the complaint operative at the time of removal and encompasses all relief a court may grant on that complaint if the plaintiff is victorious." *Id.* at 414–415.

16. CAFA's requirement that the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, is satisfied here. Although Defendant disputes liability and damages, the damages Plaintiff claims for himself and the putative class exceed $5,000,000.00.

17. When evaluating the amount in controversy, "the Court accepts the allegations contained in the complaint as true and assumes the jury will return a verdict in the plaintiff's favor on every claim." *Henry v. Central Freight Lines,*

1  *Inc.*, 692 Fed. Appx. 806, 807 (9th Cir. 2017) (citing *Campbell v. Vitran Exp., Inc.*, 471 Fed. Appx. 646, 648 (9th Cir. 2012)).

18.  A removal under CAFA may rely on "a chain of reasoning" that is based on "reasonable" "assumptions." *LaCross v. Knight Transp., Inc.*, 775 F.3d 1200, 1201 (9th Cir. 2015). Specifically, in calculating the amount in controversy, an "assumption may be reasonable if it is founded on the allegations of the complaint." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925 (9th Cir. 2019) (citing *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1198–99 (9th Cir. 2015)); *accord Salter v. Quality Carriers, Inc.*, 974 F.3d 959, 964 (9th Cir. 2020) ("[I]n *Arias* we held that a removing defendant's notice of removal need not contain evidentiary submissions but only plausible allegations of jurisdictional elements.").

19.  The putative class consists of approximately 296 current and former non-exempt employees of Defendant. Semar decl., ¶ 5a. The average base hourly rate paid to the putative class from February 22, 2021 through March 9, 2024 was $24.04. Khatoon decl., ¶ 4a. The putative class worked a total of approximately 59,402 shifts during this time period. Semar decl., ¶ 6. The putative class worked a total of approximately 7,564 biweekly pay periods during this time period. Khatoon decl., ¶ 4a. Approximately 2,519 total wage statements were provided to the putative class from February 6, 2023 through March 9, 2024. *Id.* at ¶ 4b. The putative subclass of former non-exempt employees consists of approximately 164 individuals. Semar decl., ¶ 5a.

20.  The Complaint seeks damages and penalties for a variety of alleged wage-hour violations for a period commencing on February 6, 2020. Compl., ¶¶ 17, 25–45. Plaintiff alleges that he and the putative class are entitled to recover purportedly unpaid overtime, minimum wages, and meal and rest period premiums, in addition to wage statement penalties, waiting time penalties, statutory and civil penalties, expense reimbursement, restitution, costs, and attorneys' fees. *Id.* at 19:18–22:23. Plaintiff also seeks injunctive relief. *Id.* at 17:13–14, 22:21–22.

**Overtime**

21.	In support of his overtime claim, Plaintiff alleges that Defendant engaged in a "pattern and practice of wage abuse [that] involved, *inter alia*, regularly requiring Plaintiff and the [putative] Class to work off the clock without compensation, thereby failing to pay them for all hours worked"; that Defendant "also implemented time rounding practices that at times resulted in the underpayment of wages. . . to Plaintiff and the [putative] Class"; and that Defendant "also implemented policies that prohibited Plaintiff and the [putative] Class from accurately recording the actual time worked, resulting in a failure to pay Plaintiff and the [putative] Class all wages owed." Compl., ¶ 25.

22.	Based on these allegations, it is reasonable to assume, for purposes of removal only, that putative class members were not paid for at least one hour of overtime per week from February 22, 2021 through the present. *Reyes v. Carehouse Healthcare Center, LLC*, No. SACV 16-01159-CJC(MRWx), 2017 WL 2869499, at *3 (C.D. Cal. July 5, 2017) (finding an assumption of one hour of overtime per week to be appropriate when plaintiff alleged "regular" violations).

23.	Thus, the amount in controversy on this overtime claim alone exceeds $350,000.[1]

**Minimum Wage**

24.	Like his overtime time, in support of his minimum wage claim, Plaintiff alleges that Defendant engaged in a "pattern and practice of wage abuse [that] involved, *inter alia*, regularly requiring Plaintiff and the [putative] Class to work off the clock without compensation, thereby failing to pay them for all hours worked"; that Defendant "also implemented time rounding practices that at times resulted in the underpayment of wages. . . to Plaintiff and the [putative] Class"; and

---

[1] 7,564 biweekly pay periods x 2.0 weeks per pay period x 1.0 hour per week x $24.04 average hourly base rate of pay x 1.5 (to get the overtime rate from the base rate) = $363,699.81.

that Defendant "also implemented policies that prohibited Plaintiff and the [putative] Class from accurately recording the actual time worked, resulting in a failure to pay Plaintiff and the [putative] Class all wages owed." Compl., ¶ 25.

25. As a result of these alleges practices, Plaintiff alleges that he and the putative class "were not compensated for such off the clock work"; that their hours were rounded such that they "were oftentimes not paid for all time worked"; and were not paid all wages owed as a result of purportedly being prohibited from accurately recording their actual time worked. Compl., ¶¶ 32–34.

26. Based on these allegations, it is reasonable to assume, for purposes of removal only, that putative class members were not paid for at least one hour of overtime per week from February 22, 2021 through the present. *Cabrera v. South Valley Almond Company, LLC*, No. 1:21-CV-00748-AWI-JLT, 2021 WL 5937585, at *8 (E.D. Cal. Dec. 16, 2021) (finding an assumption of one hour of one hour of unpaid minimum wages per week to be consistent with "at times" and "on occasion" allegations based on "policies and/or practices").

27. The amount of allegedly unpaid minimum wages is doubled since Plaintiff seeks to recover liquidated damages under Labor Code section 1194.2. Compl., ¶ 79; *Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 995 n.7 (2022) (permitting liquidated damages for minimum wage claim under CAFA removal). Thus, the amount in controversy on this minimum wage claim alone exceeds $225,000.[2]

---

[2] 7,564 biweekly pay periods x 2.0 weeks per pay period x 1.0 hour per week x $14.96 (weighted average minimum wage from February 22, 2021 through March 9, 2024) x 2.0 (liquidated damages per Lab. Code § 1194.2) = $226,314.80.
In 2021, the California minimum wage for employers with at least 26 employees was $14.00 per hour. In 2022, that minimum was $15.00 per hour. In 2023, that minimum was $15.50 per hour. And in 2024, that minimum has been $16.00 per hour.

**Meal Periods**

28. "Throughout the time period involved in this case," Plaintiff alleges in support of his meal period claim that "Defendants have implemented policies and practices which failed to provide Plaintiff and the [putative] Class with timely and duty-free meal periods;" that Defendant "regularly failed to relieve Plaintiff and the [putative] Class of all duties during their meal periods, regularly failed to relinquish control over Plaintiff and the [putative] Class during their meal periods, regularly failed to permit Plaintiff and the [putative] Class a reasonable opportunity to take their meal periods, and regularly impeded or discouraged Plaintiff and the [putative] Class from taking thirty (30) minute uninterrupted meal breaks no later than the end of their fifth hour of work and/or from taking a second thirty (30) minute uninterrupted meal break no later than their tenth hour of work for shifts lasting more than ten (10) hours." Compl., ¶ 26.

29. "Throughout the time period involved in this case," Plaintiff further alleges in support of his meal period claim that Defendant "did not adequately inform Plaintiff and the [putative Class of their right to take meal periods under California law;" that "Defendants often disregarded their own written policies regarding the provision and timing of meal periods for Plaintiff and the [putative] Class;" and that ***"Defendants' actual policy and practice was to schedule Plaintiff and the [putative] Class in a way Plaintiff that prohibited them from taking timely and duty-free meal periods, and to require Plaintiff and the [putative] Class to work through their meal periods,*** for which they were not compensated." Compl., ¶ 27 (emphasis added).

30. Based on these allegations, it is reasonable to assume, for purposes of removal only, that putative class members were not provided a compliant meal period 60% of the time. *Bryant v. NCR Corp.*, 284 F. Supp. 3d 1147, 1151–52 (S.D. Cal. 2018) (finding a 60% violation rate assumption to be reasonable where complaint alleged "policy and practice" of meal period violations).

FIRM:64083368v1

31. Thus, the amount in controversy on this meal period claim alone exceeds $850,000.[3]

### Rest Periods

32. "Throughout the time period involved in this case," Plaintiff alleges in support of his rest period claim that "Defendants have implemented policies and practices which prohibited Plaintiff and the [putative] Class from taking timely and duty-free rest periods," and that "Defendants regularly failed to provide, authorize, and permit Plaintiff and the [putative] Class to take full, uninterrupted, off-duty rest periods for every shift lasting three and one-half (3.5) to six (6) hours and/or two full, uninterrupted, off-duty rest periods for every shift lasting six (6) to ten (10) hours, and failed to make a good faith effort to authorize, permit, and provide such rest breaks in the middle of each work period." Compl., ¶ 29.

33. "Throughout the time period involved in this case," Plaintiff further alleges in support of his rest period claim that Defendant "did not adequately inform Plaintiff and the [putative] Class of their right to take rest periods under California law"; that Defendants often disregarded their own written policies regarding the provision and timing of rest periods for Plaintiff and the [putative] Class," and that ***"Defendants' actual policy and practice was to schedule Plaintiff and the [putative] Class in a way that regularly prohibited them from taking timely and duty-free rest periods, and to regularly require Plaintiff and the [putative] Class to work through their rest periods."*** Compl., ¶ 30 (emphasis added).

34. Based on these allegations, it is reasonable to assume, for purposes of removal only, that putative class members were not provided a compliant rest period 60% of the time. *Alvarez v. Office Depot, Inc.*, No. CV 17-7220 PSG (AFMx), 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (finding a 60% violation rate

---

[3] 59,402 shifts collectively worked by the putative class x $24.04 average hourly base rate of pay x 0.60 (violation rate) = $856,814.45.

assumption to be reasonable where complaint is indeterminate with respect to violation rates); *see also Bryant*, 284 F. Supp. 3d at 1151–52 (finding a 60% violation rate assumption to be reasonable where complaint alleged "policy and practice" of meal period violations).

35. Thus, the amount in controversy on this rest period claim alone exceeds $850,000.[4]

### Wage Statement Penalties

36. "Throughout the time period involved in this case," Plaintiff alleges that Defendant "regularly failed to provide complete or accurate wage statements to Plaintiff and the [putative] Class," and that Defendant "knew or should have known that Plaintiff and the [putative] Class were entitled to receive complete and accurate wage statements in accordance with California law, but, in fact," Defendant did not provide "complete and accurate wage statements," and these alleged "deficiencies included, *inter alia*, the failure to include the total number of hours worked, the actual gross wages earned, and the correct rates of pay." Compl., ¶ 41. Because Plaintiff's wage statement claim is derivative of his claims for failing to timely pay all overtime, minimum wages, meal period premiums and rest period premiums he contends were due, as well as accurately report all hours worked, it is reasonable to assume a 100% violation rate for his section 226(a) claim.

37. "Given the vague language of the Complaint and the broad definition of the class, it is reasonable for Defendant[] to assume a 100% violation rate" in valuing wage statement claims. *Ritenour v. Carrington Mortg. Servs. LLC*, 228 F. Supp. 3d 1025, 1030 (C.D. Cal. 2017); *accord Wicker v. ASC Profiles LLC*, No. 2:19-cv-02443-TLN-KJN, 2021 WL 1187271, at *4 (E.D. Cal. Mar. 30, 2021) ("[B]ecause it is more likely than not that putative class members each suffered one

---

[4] 59,402 shifts collectively worked by the putative class x $24.04 average hourly base rate of pay x 0.60 (violation rate) = $856,814.45.

meal and one rest break violation per week, then Defendants' 100 percent wage statement violation rate against each terminated class member is reasonably supported by the evidence.").

38. The remedy for an alleged violation of Labor Code section 226(a) is found in section 226(e)(1):

> An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

39. The amount in controversy on this claim alone, assuming a 100% violation rate, exceeds $125,000, and that is assuming the lower $50 penalty applies instead of the $100 penalty that would be available for the "subsequent" alleged violations.[5]

### Penalties for Untimely Payment of Wages During Employment

40. "Throughout the time period involved in this case," Plaintiff alleges that Defendant "regularly failed to pay Plaintiff and the [putative] Class all wages within any time permissible under California law, including, *inter alia*, California Labor Code section 204," and that Defendant "knew or should have known that Plaintiff and the [putative] Class were entitled to receive all wages owed to them during their employment," but that "Plaintiff and the [putative] Class did not receive payment of all wages, including overtime compensation, minimum wages, and meal and rest period premiums." Compl., ¶ 40.

---

[5] 2,519 wage statements x $50 penalty allegedly noncompliant wage statement x 1.0 (i.e., 100% violation rate) = $125,950.

41. The remedy for an alleged violation of Labor Code section 204 is found in section 210(a):

> 1. For any initial violation, one hundred dollars ($100) for each failure to pay each employee.
>
> 2. For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld.

42. Plaintiff's allegations reflect that the heightened penalty applies. Compl., ¶ 45 ("Defendants had the financial ability to pay such compensation, but willfully, knowingly, and intentionally failed to do so . . . .").

43. Because the remedy found in Labor Code section 210 is a penalty, there is a one-year statute of limitations. Lab. Code § 340(a). During the relevant time period since February 6, 2023, there were 2,519 pay periods collectively worked by the putative class. Khatoon decl., ¶ 4c.

44. Because Plaintiff's section 204 claim is derivative of his claims for failing to timely pay all overtime, minimum wages, meal period premiums and rest period premiums he contends were due, it is reasonable to assume a 100% violation rate for his section 204 claim. *Wicker*, 2021 WL 1187271, at *4 ("[B]ecause it is more likely than not that putative class members each suffered one meal and one rest break violation per week, then Defendants' 100 percent wage statement violation rate against each terminated class member is reasonably supported by the evidence.").

45. Thus, Plaintiff has placed more than $500,000 in controversy in connection with his section 204 claim.[6]

---

[6] 2,519 pay periods x $200 penalty per pay period x 1.0 (i.e., 100% violation rate) = $503,800.

**Waiting Time Penalties for Untimely Payment of Wages at Employment End**

46. "Throughout the time period involved in this case," Plaintiff alleges not only that Defendant "regularly failed to pay Plaintiff and the [putative] Class all wages owed to them upon discharge or resignation," but that Defendant "knew or should have known that Plaintiff and the [putative] Class were entitled to receive all wages owed to them upon termination within the time permissible under California Labor Code section 202 [or 201]," and that "Plaintiff and the [putative] Class did not receive payment of all final wages owed to them upon discharge or resignation, including overtime compensation, minimum wages, and meal and rest period premiums, within any time permissible under California Labor Code section 202." Compl., ¶ 39.

47. Because Plaintiff's claim for waiting time penalties is derivative of his claims for failing to pay all overtime, minimum wages, meal period premiums and rest period premiums he contends were due, it is reasonable to assume a 100% violation rate for his section 203 claim. That is, "because it is more likely than not that putative class members each suffered one meal and one rest break violation per week, then Defendants' 100 percent wage statement violation rate against each terminated class member is reasonably supported by the evidence." *Wicker*, 2021 WL 1187271, at *4.

48. During the relevant time period, there were 164 putative class members whose employment ended at any time since February 22, 2021. Semar decl., ¶ 5a. "During the relevant time period," Plaintiff also alleges that he "and the other [putative] Class Members regularly worked in excess of eight (8) hours in a day, and/or in excess of forty (40) hours in a week." Compl., ¶ 52. Indeed, in the final months of his employment, Plaintiff more often than not worked shifts of 12 hours or more. Semar decl., ¶ 7. And Plaintiff alleges that his "claims are typical" of the other putative class members. Thus, for purposes of calculating the daily rate of pay for purposes of Labor Code section 203, it is appropriate to consider a 12-

1  hour shift. Accordingly, Plaintiff has placed more than $1,650,000 in controversy
2  in connection with his claim for waiting time penalties.[7]

### Attorneys' Fees

49.   Based on his claims, Plaintiff also seeks to recover attorneys' fees. Compl., ¶¶ 55, 66, 75, 79, 105. In *Fritsch*, the Ninth Circuit reversed the district court's remand order under CAFA because the district court erred by failing to include future attorneys' fees recoverable by statute or contract when determining whether the amount in controversy was met. 899 F.3d at 788. Because the *Fritsch* plaintiff had demanded attorneys' fees for alleged Labor Code violations under sections 218.5, 226 and 1194, the Ninth Circuit held that, "Because the law entitles Fritsch to an award of attorneys' fees if he is successful, such future attorneys' fees are at stake in the litigation, and must be included in the amount in controversy." *Id.* at 794. Like the plaintiff in *Fritsch*, Plaintiff here demands attorneys' fees pursuant to, *inter alia*, Labor Code sections 218.5, 1194, and 2802. Compl., ¶¶ 55, 66, 75, 79, 105. Attorneys' fees are thus included in the amount in controversy here. Assuming attorneys' fees of 25% (the Ninth Circuit's benchmark[8]) of the

---

[7] 30 days (maximum statutory penalty under Cal. Lab. Code § 203) x 8 hours per day x ($24.04 average base rate of pay x 8 hours + $36.06 x 4 hours) x 164 former non-exempt employees = $1,655,875.20.

[8] The Ninth Circuit's established benchmark of 25% of damages for an award of attorneys' fees in class actions provides a reasonable basis to determine the amount of attorneys' fees that may be recovered in this case. *See Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003) ("This circuit has established 25% of the common fund as a benchmark award for attorney fees."); *Rwomwijhu v. SMX, LLC*, No. CV 16-08105-AB (PJWx), 2017 1243131, at *6 (C.D. Cal. Mar. 3, 2017) (adding 25% in attorneys' fees in determining the amount in controversy for CAFA jurisdiction).

more than $2,875,000[9] in alleged damages, restitution, and penalties sought, the amount in controversy on Plaintiff's attorneys' fees would be nearly $720,000.[10]

### Injunctive Relief

50. Plaintiff also seeks injunctive relief. Compl., 17:13–14, 22:21–22. While it is impossible to quantify the costs of compliance with any such injunction, any potential changed practice would increase the amount in controversy. *In re Ford Motor Co./Citibank*, 264 F.3d 952, 958 (9th Cir. 2011); *see also Pagel v. Dairy Farmers of Am., Inc.*, 986 F. Supp. 2d 1151, 1161 (C.D. Cal. 2013) (cost of complying with injunction may be aggregated for CAFA purposes). Accordingly, factoring in the injunctive relief that Plaintiff seeks, the amount in controversy would even further exceed $5,000,000.

### Total Amount in Controversy

51. Exclusive of expense reimbursement, interest, costs, and injunctive relief, the total amount in controversy exceeds the jurisdictional requirement of $5,000,000 as follows:

| | |
|---|---:|
| Overtime | $363,699.81 |
| Minimum wage and liquidated damages | 226,314.80 |
| Meal periods | 856,814.45 |
| Rest periods | 856,814.45 |
| Wage statement penalties | 125,950 |
| Section 210 penalties | 503,800 |
| Waiting time penalties | 1,655,875.20 |
| Attorneys' fees | 718,909.95 |
| Total: | $5,308,178.66 |

---

[9] $363,699.81 (overtime) + $226,314.80 (minimum wage liquidated damages) + $125,950 (wage statement penalties) + $503,800 (section 210 penalties) + $1,655,875.20 (waiting time penalties) = $2,875,639.81. Notably, this total does take into account the amounts that Plaintiff has placed in controversy on his meal and rest period claims, even though he seeks attorneys fees in connection with those claims. Compl., ¶¶ 66, 75; *Fritsch*, 899 F.3d at 796.

[10] $2,875,639.81 x 0.25 = $718,909.95.

Again, this total does not include any amounts for Plaintiff's expense reimbursement claim or his requests for interest, costs, or injunctive relief. Nor does this total include any post-removal amounts (other than attorneys' fees). Of course, calculating those claims would push the amount in controversy further above the $5,000,000 threshold. If challenged to do so by Plaintiff or this Court, Defendant can and will present any additional evidence to establish by a preponderance of evidence that Plaintiff's claims exceed the jurisdictional minimum of $5,000,000.00. *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) (explaining that a removing defendant need only present a short and plain statement of the grounds for federal jurisdiction in its removal papers and need not present evidence to establish the amount in controversy until challenged to do so).

### III.   TIMELINESS OF REMOVAL

52.   This notice of removal is being timely filed within 30 days of February 20, 2024, the date on which the summons and complaint were served upon Defendant.

DATED: March 21, 2024                EPSTEIN BECKER & GREEN, P.C.

By:   /s/ Kevin D. Sullivan
       Michael S. Kun
       Kevin D. Sullivan

       Attorneys for Defendant
       RURAL/METRO FIRE DEPT., INC.